## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. CCB-19-0568 |
| | ) | |
| TRAYVON HALL, et al. | ) | |
| | ) | |
| Defendants. | ) | |

### GOVERNMENT'S CONSOLIDATED MOTIONS RESPONSE

The United States of America, by and through counsel, submits this consolidated response to the defendants' pretrial motions in this case.

### TABLE OF CONTENTS

I.  INTRODUCTION AND PROCEDURAL BACKGROUND ....................................................3

II.  ARGUMENT ...............................................................................................5

  A.  Motions for Severance, by David Jackson (ECF 203) and Ronnie Finney (ECF 201).........5

      1.   The Defendants Were Properly Joined.................................................................7

      2.   A Joint Trial Will Not Prevent any Defendant from Receiving a Fair Trial..........8

      3.   An Insufficient Showing Has Been Made Regarding the Possibility of Antagonistic Defenses.............................................................................9

      4.   There Are No *Bruton* Problems Requiring Severance .......................................10

  B.  Motions to Suppress Fruits of Search Warrants...................................................11

      1.  Applicable Law .........................................................................................11

      2.  The Warrants Were Supported by Probable Cause, and the Agents Did Not Exceed the Scope of the Warrants .....................................................................12

            a.  Motion to Suppress Fruits of Search Warrants Executed on 1437 Hadwick Drive and red Mitsubishi SUV on July 31, 2019, by Trayvon Hall (ECF 197) ...............................................................................12

b.   Motion to Suppress Evidence Seized from Closed, Locked Safe During Execution of Search Warrant at 5709 Chinquapin Parkway on October 6, 2020, by Keith Pinson (ECF 172) ..............................................................18

c.   Motion to Suppress Fruits of Search Warrant Executed at 1132 Braddish Avenue on October 6, 2020, by Ronnie Finney (ECF 194) .......................22

d.   Motion to Suppress Fruits of Search Warrants Executed at 3917 Annellen Road and on a Black Kia Sedan on October 6, 2020, by Marcus Williams (ECF 177)...........................................................................................27

e.   Motion to Suppress Fruits of Search Warrant on Two Cell Phones Seized from 3917 Annellen Road on October 6, 2020, by Marcus Williams (ECF 206)...........................................................................................................32

f.   Motion to Suppress Fruits of February 22, 2019 Search Warrant on Instagram Account with Username "mitch_3rdst_way," by Ronnie Finney (ECF 196) ...........................................................................................................34

3.   The Officers Relied on the Warrants in Good Faith  ...............................36

C.   Motions to Suppress Custodial Statements ........................................................37

1.   Applicable Law ........................................................................................37

2.   Relevant Facts ..........................................................................................39

a.   Statements by Ronnie Finney on October 6, 2020 (ECF 195)  ........39

b.   Statements by Daran Hickman on October 6, 2020 (ECF 193) .......41

c.   Statements by Marcus Williams on October 6, 2020 (ECF 176) .....42

d.   Statements by Alvin Johnson on October 6, 2020 (ECF 190)..........43

3.   The Defendants' Statements Followed Valid *Miranda* Waivers ........................44

4.   The Defendants' Statements Were Voluntary......................................................46

D.   Motions to Suppress Fruits of Warrantless Searches, by David Jackson (ECF 204), and Ronnie Finney (ECF 198) ...........................................................................................50

E.   Motion to Reveal Identities of Informants, by Alvin Johnson (ECF 191) .........................53

F.  Motions to Adopt Motions of Other Defendants, by Alvin Johnson (ECF 189), Daran Hickman (ECF 202), Marcus Williams (ECF 178), Ronnie Finney (ECF 200), and Trayvon Hall (ECF 199) ......................................................................................................................55

G.  Motion for Leave to File Additional Motions, by Marcus Williams (ECF 205) ...............56

III.  Conclusion .......................................................................................................................56

# I.  INTRODUCTION AND PROCEDURAL BACKGROUND

On September 30, 2020, a federal grand jury for the District of Maryland returned a Superseding Indictment[1] charging ten members of the Eight Tray Gangster Crips (ETG Crips) with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (Count 1); and conspiracy to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846 (Count 2). ECF 20. The indictment also charges the gang's leader, Trayvon HALL, with two counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), based on the November 11, 2016 murder of Shyheim Brown (Count 3), and the July 6, 2018 murder of Steven McKnight (Count 4). HALL is also charged with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g) (Count 12). Other defendants are charged with various acts of violence and guns offenses. Devon POWELL is charged with assault with a dangerous weapon resulting in serious bodily injury in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3) (Count 5); using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 6); and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g) (Count 11). Ridgley SHIPLEY is charged with Hobbs Act robbery conspiracy and Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Counts 7 and 8); using, carrying, and

---

[1]     The original indictment, returned on December 3, 2019, charged Ridgley SHIPLEY with Hobbs Act robbery and Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a); using, carrying, and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). ECF 1. Those charges have been incorporated in the Superseding Indictment. *See* ECF 20, Counts 7–10.

brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count 9); and possession of a firearm by a felon (Count 10).

Trial is scheduled for five weeks from September 12, 2022 to October 14, 2022. A motions hearing date has not yet been scheduled.

Eight defendants—HALL, FINNEY, HICKMAN, JACKSON, JOHNSON, PINSON, SHIPLEY, and WILLIAMS—have filed a total of twenty-five pretrial motions. These consist of motions for severance, motions to suppress the fruits of search warrants and warrantless searches, motions to suppress statements, a motion to suppress in-court and out-of-court identifications, a motion to reveal the identities of informants, motions to adopt the motions of other defendants, and motions for leave to file additional motions. The government expects to reach a plea agreement with SHIPLEY in the near future, and his counsel has asked that we not respond to his motions.

A chart of pending motions filed by each defendant follows:

| Defendant | Motion | ECF No. |
|---|---|---|
| Alvin Johnson | Motion to Join in Motions of Other Defendants | 189 |
| | Motion to Suppress Custodial Statement on October 6, 2020 | 190 |
| | Motion to Reveal Identities of Informants | 191 |
| Daran Hickman | Motion to Suppress Custodial Statement on October 6, 2020 | 193 |
| | Motion to Adopt Motions of Other Defendants | 202 |
| David Jackson | Motion to Sever | 203 |
| | Motion to Suppress Predicate Act Searches and Seizures (February 12, 2010; May 20, 2013; February 19, 2014; July 16, 2014; January 17, 2017; February 14, 2017; and September 7, 2017) | 204 |
| Keith Pinson | Motion to Suppress Evidence from Closed, Locked Safe Within 5709 Chinquapin Parkway on October 6, 2020 | 172 |
| Marcus Williams | Motion to Suppress Custodial Statement on October 6, 2020 | 176, 179[2] |
| | Motion to Suppress Fruits of Search Warrant at 3917 Annellen Road and Black Kia Sedan on October 6, 2020 | 177 |
| | Motion to Adopt Motions of Other Defendants | 178 |

---

[2]   ECF 179 is Marcus WILLIAMS' corrected motion to suppress statements, and it is the operative motion.

|  | Motion for Leave to File Additional Pretrial Motions | 205 |
|--|------------------------------------------------------|-----|
|  | Motion to Suppress Fruits of Search Warrant for Two Cell Phones Seized on October 6, 2020 | 206 |
| **Ridgley Shipley** | Motion to Suppress Fruits of Traffic Stop and Warrantless Search of Vehicle on November 3, 2015 | 184 |
|  | Motion to Suppress Various Stops, Arrests, and Searches (March 21, 2008; January 16, 2009; January 14, 2010; November 28, 2017; and June 23, 2019) | 185 |
|  | Motion to Suppress Out-of-Court Identifications on January 5, 2010 and June 23, 2019 | 186 |
|  | Motion to Suppress Fruits of December 9, 2019 Search Warrant on Instagram Account with Username "etgshorty" | 187 |
|  | Motion to Suppress Custodial Statements on January 16, 2009 and June 23, 2019 | 188 |
| **Ronnie Finney** | Motion to Suppress Fruits of Search Warrant at 1132 Braddish Avenue on October 6, 2020 |  |
|  | Motion to Suppress Custodial Statement on October 6, 2020 | 195 |
|  | Motion to Suppress Fruits of February 22, 2019 Search Warrant on Instagram Account with Username "mitch_3rdst_way" | 196 |
|  | Motion to Suppress Search and Seizure Constituting Predicate Acts on August 15, 2008; January 14, 2010; January 20, 2010; November 23, 2010; July 9, 2011; and July 26, 2013 | 198 |
|  | Motion to Adopt Motions of Other Defendants | 200 |
|  | Motion to Sever | 201 |
| **Trayvon Hall** | Motion to Suppress Fruits of Search Warrant at 1437 Hadwick Drive on July 31, 2019 | 197 |
|  | Motion to Adopt Motions Filed by Co-Defendant | 199 |

The speaking indictment contains a more thorough description of the history and structure of the ETG Crips, how the gang operated, as well as the defendants' criminal activities in furtherance of the racketeering conspiracy. *See* ECF 20. In this memorandum, we will discuss relevant facts in the context of each motion. Where the relevant facts and legal issues overlap, we will address groups of motions together.

## II.   ARGUMENT

### A.  Motions for Severance, by David Jackson (ECF 203) and Ronnie Finney (ECF 201)

Defendants David JACKSON and Ronnie FINNEY have moved to sever their trials. Both

defendants argue that the different degrees of culpability among defendants creates a risk of prejudicial spillover and juror confusion.   JACKSON points out that the allegations against him "primarily involve drugs," and he is not alleged to have committed a robbery, murder, or conspiracy to commit murder.   ECF 203, at 1–2.   He also speculates that the evidence of his membership in the ETG Crips "may be thin."   ECF 203, at 2.   FINNEY alleges that he and his co-defendants have "mutually exclusive and antagonistic defenses" and that "the evidence against the other defendants is substantially greater" that the evidence against him.   ECF 201, at 1–2.   He also points out that he is not charged separately in any drug or weapons counts or charged with any death-eligible counts.   ECF 201, at 2.

The motions for severance should be denied.   The defendants were properly joined as members of the same racketeering and drug trafficking conspiracies, and a joint trial would not prevent any defendant from receiving a fair trial.   Neither JACKSON nor FINNEY raise irreconcilable defenses or point to any specific evidence that would be admissible against co-defendants at a joint trial but inadmissible as to them.

When defendants are properly joined under Federal Rule of Criminal Procedure 8(b), as in this case, severance under Federal Rule of Criminal Procedure 14 is justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539 (1993).   The party moving for severance must establish that "actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir. 1995) (citations and internal quotations omitted), *cert. denied,* 515 U.S. 1151 (1995).   Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief, if any, to

the district court's sound discretion. *Zafiro*, 506 U.S. at 538.

It is well-settled that there is a preference in the federal system for joint trials of defendants who are indicted together. *Id.* at 537. Indeed, the Fourth Circuit has held that "[b]arring special circumstances, . . . the general rule is that defendants indicted together should be tried together for the sake of judicial economy." *United States v. Rusher*, 966 F.2d 868, 877 (4th Cir.) (internal quotations omitted), *cert. denied*, 506 U.S. 926 (1992). Specifically, courts have recognized that severance creates an unnecessary burden and inefficiency for the court, the government, and the witnesses, by requiring the presentation of the same case on multiple occasions. As a result, claims of potential prejudice generally are addressed through limiting instructions rather than severance. *See Zafiro*, 506 U.S. at 539; *United States v. Hayden,* 85 F.3d 153, 160 (4th Cir. 1996); Fed. R. Evid. 105.

### 1.    The Defendants Were Properly Joined

As an initial matter, the defendants in this case were properly joined pursuant to Federal Rule of Criminal Procedure 8(b). Specifically, the defendants are all charged in the same racketeering conspiracy and drug trafficking conspiracy and therefore plainly "are alleged to have participated in . . . the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Indeed, a case involving a single conspiracy is precisely the type of case in which co-conspirators should be tried together, since nearly all of the evidence presented by the government in its case-in-chief will pertain to all defendants. *See, e.g., Zafiro,* 506 U.S. at 537–38; *United States v. Akinkoye,* 185 F.3d 192, 197 (4th Cir. 1999), *cert. denied,* 528 U.S. 1177 (2000) ("Generally, we adhere to the rule that defendants charged with participation in the same conspiracy are to be tried jointly."). Accordingly, the presumption in this case is that all of the defendants should be tried together.

7

### 2.    A Joint Trial Will Not Prevent any Defendant from Receiving a Fair Trial

A district court should grant a severance under Rule 14 only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539.  There is no such risk in this case.  None of the defendants allege irreconcilable defenses such that one defendant's claim of innocence depends upon a co-defendant's guilt.  *See id.* at 538.  And the defendants are roughly evenly matched in terms of their culpability: all ten are alleged to have participated in both drug trafficking offenses *and* violent offenses in furtherance of the racketeering conspiracy.  Contrary to JACKSON's claim, he is alleged to have threatened to retaliate against Victim 10 for testifying as a witness against a member of the ETG Crips.   While Victim 10 was testifying on the stand, JACKSON made gestures that mimicked the shooting of a firearm at Victim 10 and mouther the word "rat."   ECF 20, at 27.   The judge and attorneys discussed the incident on the record during a sidebar conference.   FINNEY is alleged to have participated in an ongoing conspiracy to murder members of the rival Abington Avenue drug organization following the killing of Mitch Finney in Summer 2017.  ECF 20, at 24, 32–34.  Both JACKSON and FINNEY are also alleged to have possessed firearms in furtherance of the gang.  ECF 20, at 12, 19, 27, 29, 30, 36, 38, 39, 40, 41.   Indeed, when FBI agents arrested FINNEY on October 6, 2020 in connection with this case, he was found to be in possession of a 9mm caliber semi-automatic handgun with serial number PF94DV2, an extended magazine loaded with 27 rounds of 9mm ammunition, and another magazine loaded with 9 rounds of 9mm ammunition.

The Court should reject the argument that JACKSON and FINNEY will be prejudiced by evidence of gang activity and violence.  The evidence at trial will establish that both were members of the ETG Crips and intimately involved in the gang's affairs.  It is frequently the case that

8

members of a criminal gang play different roles in the conspiracy—some might generate revenue for the gang by engaging in drug sales, while others might serve as enforcers or "muscle." Although the defendants may have played different roles in the charged conspiracy, *all* of them benefitted from the violence carried out by ETG Crips members to preserve the gang's territories, eliminate rivals, and silence witnesses.  Any risk of prejudice from perceived differences in the defendants' levels of relative culpability can be resolved by "less drastic measures [than severance], such as limiting instructions."  *Zafiro,* 506 U.S. at 539; *see also United States v. Brugman*, 655 F.2d 540, 543 (4th Cir. 1981) ("The language of Rule 8(b) assumes certain evidence may be admitted against one defendant not necessarily applicable to another."); *United States v. Baker,* 10 F.3d 1374, 1388 (9th Cir. 1993) (finding no prejudice despite differences in culpability), *cert. denied,* 513 U.S. 934 (1994); *See also Akinkoye,* 185 F.3d at 197 (holding that there is no right to severance merely "because the evidence against one defendant is not as strong as that against the other") (citing *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir.), *cert. denied*, 505 U.S 1228 (1992)).

### 3.   An Insufficient Showing Has Been Made Regarding the Possibility of Antagonistic Defenses

The Fourth Circuit has recognized that "[t]he presence of antagonistic defenses alone does not require severance."  *United States v. Najjar*, 300 F.3d 466, 474 (4th Cir. 2002) (quoting *Zafiro,* 506 U.S. at 538); *see also United States v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986) ("The mere presence of hostility among defendants . . . or a desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials.").  Rather, to justify severance, "[t]here must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other, or that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." *Najjar*,

300 F.3d at 474.

In this case, FINNEY has not come close to meeting his burden of showing that he and his co-defendants have mutually exclusive or antagonistic defenses.  He has not suggested any defense that stands in "stark contrast" with a co-defendant's defense.  *See id.*  Nor has he pointed to any evidence that he would seek to admit that another defendant would oppose, or vice versa.  *Cf. United States v. Dinkins*, 691 F.3d 358, 369 (4th Cir. 2012) (affirming denial of severance motion even though one defendant joined the government in seeking admission of certain hearsay statements that other defendants opposed).  Accordingly, this Court should reject that argument as a reason for any severance in this case.

### 4.    There Are No *Bruton* Problems Requiring Severance

The government does not intend to introduce the testimonial confession of a non-testifying defendant that directly implicates another defendant in wrongdoing.  *See Bruton v. United States,* 391 U.S. 123 (1968).  To the extent the government seeks to admit any such confessions, it will do so by calling the confessor to the witness stand.

In any event, the proper remedy for a potential *Bruton* violation is not to sever the trials of the defendants, but instead to edit or redact the testimonial statement in order to eliminate the Confrontation Clause problem.  As the Supreme Court held in *Richardson v. Marsh,* 481 U.S. 200, 211 (1987), the Confrontation Clause is not violated when a non-testifying co-defendant's confession is redacted to eliminate any reference to the other co-defendant's existence.  Moreover, the Supreme Court has specifically held that there is no Sixth Amendment violation unless the confession sought to be introduced contains "facially incriminating statements," rather than merely statements which become incriminating when linked to other evidence.  *Richardson,* 481 U.S. at 208–09; *see also Akinkoye,* 185 F.3d at 197–98 (finding that when a non-testifying co-defendant's

10

statement is redacted and read into evidence such that the statements do not refer to the existence of the defendant, severance is not required).

## B. Motions to Suppress Fruits of Search Warrants

### 1. Applicable Law

A judicial officer's determination that there is probable cause to issue a search warrant is a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). Probable cause means far "less than evidence which would justify condemnation or conviction," *Brinegar v. United States*, 338 U.S. 160, 175 (1949), and even less than a preponderance of the evidence, *see Gates*, 462 U.S. at 235; *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004) ("[T]he probable cause standard does not require that the officer's belief be more likely true than false."). The statement of probable cause need not be written with "[t]echnical elaborate specificity," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), and a "magistrate has the authority … to draw such reasonable inferences as he will from the material supplied to him by applicants for a warrant," *Bynum*, 293 F.3d at 197. Probable cause may be established through information provided by any reliable source or sources, *Draper v. United States*, 358 U.S. 307, 313 (1959), or even through an anonymous tip that has been corroborated, *see Gates*, 462 U.S. at 241.

"Because probable cause is evaluated through a totality-of-the-circumstances analysis rooted in common sense," a reviewing court should give "great deference" to an issuing judicial officer's decision to issue a warrant based on the facts before him. *Montieth*, 662 F.3d at 664. The reviewing court is not to conduct a *de novo* determination of probable cause but, instead, must

determine whether the magistrate judge had a substantial basis to conclude that probable cause existed at the time the search warrant was issued. *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990).

Finally, as discussed further in Section II.B.3 below, the exclusionary rule does not apply when law enforcement officers act in "objectively reasonable" reliance on a warrant later held invalid. *See United States v. Leon*, 468 U.S. 897, 922 (1984).

> **2.    The Warrants Were Supported by Probable Cause, and the Agents Did Not Exceed the Scope of the Warrants**
>
> > **a.    Motion to Suppress Fruits of Search Warrants Executed on 1437 Hadwick Drive and red Mitsubishi SUV on July 31, 2019, by Trayvon Hall (ECF 197)**

HALL has moved to suppress evidence seized during the execution of search warrants on his residence and vehicle on July 31, 2019. The warrants were issued by United States Magistrate Judge Stephanie A. Gallagher on July 30, 2019. *See* Exhibit 1 (Hall Warrant). They authorized agents to search HALL's residence at 1437 Hadwick Drive, Essex, Maryland, a red Mitsubishi SUV known to be operated by him, and his Apple iPhone for evidence of possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. 922(g). During the search of the red Mitsubishi, FBI agents recovered, among other items, a Smith & Wesson .40 caliber handgun bearing serial number HLA8409, loaded with 13 rounds of .40 caliber ammunition. The firearm was hidden behind the dashboard panel.

HALL argues that the agents failed to adhere to the warrant's requirement that it be executed "in the daytime 6:00 a.m. to 10:00 p.m." ECF 197, at 2; *see also* Ex. 1, at 1. He also argues that the agents exceeded the scope of the warrant by seizing "handwritten documents and copies of what appear to be related to law enforcement investigations," which were not "indicia of occupancy, residency and ownership." ECF 197, at 3. Both claims are meritless.

12

First, the agents fully complied with the warrant's timing requirement and did not begin searching the residence or vehicle until 6:00 a.m.  As laid out in HALL's memorandum, the agents set up pre-raid surveillance outside the residence at approximately 4:00 a.m.  At approximately 4:37 a.m., the agents observed HALL and his girlfriend, Ashley David, exit the residence and walk toward the red Mitsubishi SUV.  The agents had an arrest warrant for HALL and a search warrant for the vehicle, so they immediately arrested HALL and detained David.  An FBI Special Weapons and Tactics (SWAT) team then conducted a sweep of the residence to ensure that there was no one inside who could destroy evidence or pose a danger.  Once the residence was secured, agents brought HALL and David back inside the residence and read them their *Miranda* rights.  HALL was permitted to retrieve clothing he requested from his bedroom.  The agents then waited until precisely 6:00 a.m. to begin the search of the residence and vehicle.

The pre-dawn entry into the residence in order to secure the location was reasonable and in no way tainted the warrant.  Although "warrantless entries into a person's home are presumptively unreasonable," there is a longstanding exception to the warrant requirement "when exigent circumstances exist." *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981).  Pursuant to this exception, the Fourth Circuit has recognized that "when officers have probable cause to believe that contraband is present and, in addition, they reasonably believe that the evidence may be destroyed or removed before they can secure a search warrant, a warrantless entry is justified." *Id.*  In determining whether exigent circumstances exist, courts consider "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband." *Id.* (exigent

circumstances justified warrantless entry where there was a rational basis for officers' belief that the individual inside the residence was aware of police presence and that drug evidence might be destroyed); *United States v. Moses,* 540 F.3d 263, 270 (4th Cir. 2008) (exigent circumstances justified warrantless entry into a suspected stash house where a commotion in the area provided a reasonable basis for police officers to believe that individuals in the residence were aware of police presence). Here, as in *Turner* and *Moses*, the FBI agents had probable cause to believe that there was evidence of illegal possession of a firearm and ammunition inside 1437 Hadwick Drive (evidence that is readily destructible), that the occupants were now aware the police were preparing to execute a warrant, and that they were likely to cause the destruction of evidence prior to the warrant's start time of 6:00 a.m. Accordingly, they were justified in making entry to secure the location and ensure that evidence was not destroyed before execution of the warrant.

Even if exigent circumstances did not justify the FBI's warrantless entry into the residence, suppression would not be appropriate because the pre-dawn entry in no way tainted the already-issued warrant. Suppression is not required "if the search warrant was based upon a source genuinely independent of the prior illegal entry." *United States v. Campbell,* 945 F.2d 713, 714 (4th Cir. 1991) (citing *Murray v. United States,* 487 U.S. 533 (1987)). In *Murray*, the Supreme Court held that evidence seized pursuant to a subsequently issued warrant would be admissible provided that the seizure was genuinely independent of the earlier illegal activity. *Murray*, 487 U.S. at 542. Here, unlike in *Murray*, the officers had *already* obtained the warrant before making entry into the house, and therefore it could not possibly have been tainted. As in *Murray*, each and every fact contained in the search warrant affidavit was known to law enforcement before entry was made, and the issuing judge was not presented with any information obtained during the subsequent pre-dawn entry. Therefore, the evidence seized pursuant to the warrant was

14

independent of any illegal activity, and HALL's motion should be denied.

Second, the agents did not exceed the scope of the warrant.  The Supreme Court has held that courts should assess the permissible scope of a search warrant "in a commonsense and realistic fashion," requiring practical accuracy but not technical precision.  *See United States v. Ventresca*, 380 U.S. 102, 108 (1965).  Here, the warrant authorized the seizure of evidence relating to the crime of possession of a firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g), namely:

> 1.    Ammunition
> 2.    Books, records, receipts, ***notes***, ledgers, images, ***and other papers relating to firearms or ammunition***, including but not limited to receipts for the rental or purchase of firearms or ammunition.
> 3.    Photographs depicting firearms or ammunition, or Trayvon HALL in possession of firearms or ammunition.
> 4.    ***Indicia of occupancy, residency, and ownership of the Subject Residence*** described in Attachment A-1, ***including but not limited to***: utility and telephone bills, envelopes, keys, photographs of Trayvon HALL and/or his known or unknown associates, ***handwritten documents or notes***, and address books, contact lists, ***or other papers reflecting names***, addresses, or telephone numbers ***of HALL and/or his known or unknown associates***.
> 5.    Cellular phones, computers, tablets, or other electronic communications devices that can be used to access Instagram.  Investigators intend to apply for a separate warrant to search any such devices other than the Target Telephone in the event they are seized.

Ex. 1, at 32, 34 (emphasis added).  Pursuant to the warrant, the agents seized several pieces of paperwork tying HALL to the residence and vehicle.  From a bedroom in the residence, they recovered a handwritten document that appeared, based on context, to have been written by HALL, as it made reference to one of his monikers ("The Goat"); "KStreet" (short for Kossuth Street, where HALL spent much of his time); and committing retaliatory shootings on behalf of "Mitch" (*i.e.*, Mitch Finney, a member of the ETG Crips who was killed by rivals on July 17, 2017).  *See* Exhibit 2 (Hall Handwritten Document).  From the glove compartment of the red Mitsubishi, they recovered a handwritten letter addressed to HALL ("O.G. Tru") from unindicted co-conspirator

Steve Milhouse, a/k/a "Stevo," along with excerpts of Baltimore Police Department (BPD) reports detailing information provided by witnesses against Milhouse in a homicide investigation.  *See* Exhibit 3 (Letter to Hall).  The BPD paperwork was found with the handwritten letter and was stained with the same coffee-like liquid.  *See id.*  It appeared to come from Milhouse's state discovery packet, as it was Bates-stamped in the bottom right corner. *Id.* at 2–3.  The agents reasonably concluded that the letter and BPD paperwork were part of the same mailing from Milhouse to HALL, and that Milhouse was warning HALL about possible witnesses against the gang.  The letter from Milhouse used ETG Crips terminology such as "What's m8v3n 3rd"[3] and referenced other members of the conspiracy such as "Gotti" (*i.e.*, PINSON).  *Id.* at 1.[4]

The paperwork seized fell squarely within the scope of the warrant because it tended to demonstrate that HALL resided at 1437 Hadwick Drive and operated the red Mitsubishi SUV, and therefore to tie him to the seized firearm and ammunition.  *See United States v. Wardrick*, 350 F.3d 446 (4th Cir. 2003) (holding that gas and electric bills, refund notice, driver's license, and holsters could be seized under search warrant for defendant's residence, even though not listed therein, inasmuch as they linked defendant to the premises where illegal firearms were found, and holsters further linked defendant to illegal possession of firearms).  Indeed, the warrant specifically listed "handwritten documents or notes" and "other papers reflecting names . . . of HALL and/or his known or unknown associates" as examples of indicia of occupancy, residency, or ownership that

---

[3]     Members of the ETG Crips commonly replace the "o" and "i" in "moving" with the numbers 8 and 3 to signify "Eight Trey."  "What's m8v3n" is a common ETG Crips greeting or way of asking "What's up?"

[4]     The agents also took photographs of other items tying HALL to the residence and vehicle, such as a Maryland traffic violation warning for Trayvon Hall, Xfinity and Comcast bills mailed to Trayvon Hall at 1437 Hadwick Drive, a typed resume for Trayvon Hall, and Greyhound bus tickets in the name of Trayvon Hall.

were subject to seizure.  Ex. 1, at 32, 34.  The handwritten document from the house also fell within the scope of the warrant because it made reference to shootings and therefore constituted a "note[]" or "other paper[] relating to firearms or ammunition."  *See* Ex. 2 ("I took you on your first mission shot and you fucking missed em.  I shot an I fucking hit em jus so you can fucking finish"); *see also id.* ("When you see me just salute an pray that I don't shoot.").

Even if the paperwork did not fall within the scope of the warrant, it was properly seized pursuant to the "plain view" exception to the warrant requirement, as was the firearm.  The Supreme Court has held that officers may properly seize articles of incriminating character that they come across while performing a search in a given area pursuant to a valid search and seizure warrant.  *See Horton v. California,* 496 U.S. 128, 135 (1990); *see also United States v. Uzenski,* 434 F.3d 690 (4th Cir. 2006).  In such "plain view" situations, the police have an original justification for intruding on a person's private property, and can extend that justification to seize those items whose incriminating nature is immediately apparent.  *Horton*, 496 U.S. at 136–37; *see also United States v. Wells*, 98 F.3d 808, 809–10 (4th Cir. 1996); *United States v. Legg*, 18 F.3d 240, 242 (4th Cir. 1994).

Here, the FBI agents were authorized by the warrant to search any areas in HALL's residence and vehicle that could contain the items to be seized, which included ammunition, cell phones, documents, and receipts.  They properly searched inside closets, containers, and compartments where such items might be concealed.  In the course of searching these areas, they came across a letter addressed to HALL from an unindicted co-conspirator using ETG Crips terminology, and a handwritten note by HALL that talked about shooting rivals of the ETG Crips. They reasonably concluded that both items were evidence of HALL's involvement in the racketeering conspiracy under investigation.  These items were in plain view within containers the

officers were authorized to search, and their "incriminating character" was "immediately apparent." *See Horton,* 496 U.S. 128; *Uzenski*, 434 F.3d 690.  Accordingly, the agents were justified in seizing them, regardless whether they constituted evidence of illegal possession of a firearm and ammunition or indicia of occupancy, residency, or ownership.

> **b.   Motion to Suppress Evidence Seized from Closed, Lock Safe During Execution of Search Warrant at 5709 Chinquapin Parkway on October 6, 2020, by Keith Pinson (ECF 172)**

PINSON has moved to suppress evidence recovered from a locked safe during the execution of a search warrant at his residence on October 6, 2020.  He argues that the warrant for his residence "did not permit the opening of sealed, closed containers," and that "nothing about the safe indicated that it contained contraband."  ECF 172, at 1–2.  PINSON's motion should be denied.

On October 5, 2020, United States Magistrate Judge Thomas M. DiGirolamo authorized a search warrant for a number of residences and vehicles, including Keith PINSON's residence at 5709 Chinquapin Parkway, Apt. C, Baltimore, Maryland.  *See* Exhibit 4 (Takedown Warrant). The warrant authorized law enforcement to search "[t]he dwelling," without limitation, *id.* at 40, and to seize evidence of PINSON's affiliation with the ETG Crips and of the racketeering conspiracy, such as gang paperwork, gang paraphernalia, cell phones, and indicia of occupancy, residency, and ownership, *see id.* at 38–39, 52.

FBI agents executed the warrant on October 6, 2020, at approximately 6:00 a.m.  The only people located inside the residence were PINSON, his girlfriend, Dominique Knight, and two young children, aged 6 and 1.  From the master bedroom of the apartment, the agents recovered multiple cell phones as well as ETG Crips apparel, such as blue jerseys labeled "K Gotti 83."[5]  In

---

[5]      "K Gotti" is PINSON's street name, and the number "83" is shorthand for "Eight Tray"

a closet in the master bedroom, the agents located two safes—a black safe and a large, light gray safe. PINSON's girlfriend, Ms. Knight, told agents that the black safe was hers but the light gray safe was not hers. The agents opened the light gray safe and recovered a 9mm caliber Taurus PT11G2 handgun with serial number TJZ89679, a magazine containing 10 rounds of 9mm ammunition, an extended magazine containing 23 rounds of 9mm ammunition, two plastic bags containing 19 rounds of 9mm ammunition, a box containing 50 rounds of 9mm ammunition, and several pieces of paperwork in PINSON's name, including a Maryland certificate of title for a 2016 Volvo and loan paperwork for a 2009 GMC.



The agents lawfully searched inside the locked safe in PINSON's bedroom closet. The Supreme Court has held that a warrant to search a home or vehicle authorizes law enforcement to

and a reference to the gang's founding on 83rd Street in Los Angeles, California.

open and search any "container that may conceal the object of [the] search authorized by [the]

warrant." *United States v. Ross*, 456 U.S. 798, 823 (1982).  The Court in *Ross* explained:

> A lawful search of fixed premises generally extends to the entire area in which the
> object of the search may be found and is not limited by the possibility that
> separate acts of entry or opening be required to complete the search.  Thus, a warrant that
> authorizes an officer to search a home for illegal weapons also provides authority
> to open closets, chests, drawers, and containers in which the weapon might be
> found.  A warrant to open a footlocker to search for marihuana would also authorize
> the opening of packages found inside.  A warrant to search a vehicle would support
> a search of every part of the vehicle that might contain the object of the search.
> When a legitimate search is under way, and when its purpose and its limits have
> been precisely defined, nice distinctions between closets, drawers, and containers,
> in the case of a home, or between glove compartments upholstered seats, trunks,
> and wrapped packages, in the case of a vehicle, must give way to the interest in the
> prompt and efficient completion of the task at hand.

*Id.* at 820–21.

Pursuant to *Ross*, numerous cases in the Fourth Circuit have held that police do not exceed

the scope of a warrant by searching closed containers or locked safes within the geographical area

of the warrant that could contain the objects of the search.  *See United States v. Jordan*, 485 F.

Supp. 3d 664, 671–72 (E.D. Va. 2020) ("While the search warrant did not give express authority

to search the safe, it was reasonable for police officers executing the warrant to believe they would

find in the safe the items for which they were authorized to search.  Therefore, the Court rejects

[the defendant's] argument that there was no authority to break into and search the locked safe

found in his home."); *United States v. Brown*, No. 90-5738, 1992 WL 46383, at *7 (4th Cir. Feb.

12, 1992) (unpub.) (holding that warrant to search defendant's residence for books and ledgers

authorized police to search within defendant's refrigerator drawer because "[a] warrant to search

a home for evidence authorizes the police to search *anywhere* in that home where the evidence

*might* be found") (emphasis in original); *United States v. Rose*, 321 Fed. App'x 324, 327 (4th Cir.

2009) (unpub.) (holding that warrant to search defendant's residence for drugs authorized police

to "lawfully open any bags, closets, drawers, or containers found in the apartment in which drugs might be found"); *United States v. Legall*, No. 4:12cr106, 2013 WL 623500, at \*8–9 (E.D. Va. Feb. 19, 2013) (unpub.) (applying *Ross* to find that warrant to search home for drugs authorized officers to search containers and packages within the home in which drugs might reasonably be found); *United States v. Poole*, 718 F.2d 671, 674 (4th Cir. 1983) (holding that warrantless search of locked trunk of vehicle was lawful because "police officers 'who have legitimately stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it . . . may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant'") (quoting *Ross*, 456 U.S. at 821); *cf. United States v. Jones*, 952 F.3d 153 (4th Cir. 2020) (holding that warrant properly authorized search of defendant's entire house, including any safes and locked boxes, reasoning that "[t]he geographical scope of a warrant complies with the Fourth Amendment if, in light of common-sense conclusions about human behavior, there is a fair probability that contraband or evidence of a crime will be found in the areas delineated by the warrant").

Other Circuit Courts are in agreement.  The Eleventh Circuit has held that  "a search may be extensive as reasonably necessary as required to locate the items described in the warrant, and is not limited by the possibility that separate acts of entry or opening may be required to complete the search."  *United States v. Jackson*, 120 F.3d 1226, 1228–29 (11th Cir. 1997).  Therefore, "a warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the objects of the search."  Similarly, the Fifth Circuit rejected a defendant's argument that agents exceeded the scope of a warrant for the defendant's residence by searching a locked jewelry box within the residence that was capable of fitting the objects sought in the warrant.  *United States v. Morris*, 647 F.2d 568, 572–73 (5th Cir. 1981).  As

the Fifth Circuit explained in *Morris*, "To follow [the defendant's] logic would require either that an additional search warrant be obtained for each container within a larger container, or that the agent seeking the warrant possess extrasensory perception so that he could describe, prior to entering the house, the specific boxes, suitcases, sofas, closets, etc. that he anticipated searching. Obviously, neither alternative is either reasonable or required."[6]

Here, the warrant authorized the agents to search PINSON's entire residence, without limitation.  The agents reasonably believed that the large, light gray safe in the master bedroom closet belonged to PINSON and that it might contain the objects of the search, such as gang paperwork, cell phones, or paperwork tying PINSON to the residence.  Although PINSON claims that "nothing about the safe indicated that it contained contraband," ECF 172, at 1–2, the same would be true of nearly any safe, opaque container, drawer, cabinet, or even closet.  Most criminals do not conspicuously label their contraband.  The key point is that the safe was large enough to contain (and, in fact, did contain) the objects of the search.  In the course of searching the safe, the agents discovered items that were clearly contraband—the firearm and ammunition.  These items were in plain view within a container the agents were authorized to search, and their "incriminating character" was "immediately apparent."  *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing *Horton*, 496 U.S. at 136–37).  Accordingly, the agents were justified in seizing them, regardless whether they were specifically listed in Attachment B.

### c.   Motion to Suppress Fruits of Search Warrant Executed at 1132 Braddish Avenue on October 6, 2020, by Ronnie Finney (ECF 194)

FINNEY has moved to suppress a gun and drugs recovered during the execution of the

---

[6]      PINSON's reliance on *Robbins v. California*, 453 U.S. 420 (1981) and *United States v. Chadwick*, 433 U.S. 1 (1977) is misplaced.  *See* ECF 172, at 1–2.  The Supreme Court expressly overruled the holdings of *Robbins* and *Chadwick* in *Ross*, 456 U.S. at 825, and *California v. Acevedo*, 500 U.S. 565, 579–80 (1991), respectively.

takedown warrant at his residence at 1132 Braddish Avenue on October 6, 2020.  *See* Ex. 4.  The warrant authorized law enforcement to seize evidence of FINNEY's affiliation with the ETG Crips and of the racketeering conspiracy, such as gang paperwork, gang paraphernalia, cell phones, and indicia of occupancy, residency, and ownership.  *See id.* at 10, 38–39, 52.  FINNEY argues that the warrant did not provide a sufficient nexus between his "alleged criminal activity, the residence to be searched, and the things to be seized."  ECF 194, at 2.  His motion should be denied.

The search warrant supplied ample probable cause to believe that FINNEY's residence would contain evidence and instrumentalities of racketeering conspiracy.  The facts supporting probable cause included the following:

- A federal grand jury had returned an indictment charging FINNEY with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and drug trafficking conspiracy, in violation of 21 U.S.C. § 846, Ex. 4 at ¶ 13, based on an extensive investigation involving "debriefings of cooperating witnesses; search warrants on Instagram accounts used by members of the ETG Crips (and publicly available posts); YouTube videos featuring members of the ETG Crips; historical arrests of members of the ETG Crips and seizures of drugs, guns, and gang paperwork; forensic analysis of cell phones recovered from members of the ETG Crips incident to their arrests; recorded jail calls made by and to members of the ETG Crips; a DEA-led wiretap investigation in 2017; ballistic evidence; and cell site location data for cell phones used by members of the ETG Crips," *id.* at ¶ 15.

- Based on this evidence, investigators knew that "ETG Crips often keep and disseminate gang paperwork documenting the gang's history, structure, rules, and coded terminology" and that "members of the gang frequently store such gang paperwork in their residences and vehicles."  *Id.* at ¶ 17.

- In addition, investigators knew that members of gangs such as the ETG Crips "commonly use cell phones and social media platforms like Instagram to facilitate their illegal activities"; that they "commonly install the Instagram 'app' on their cell phones, which they frequently . . . store in their residences and vehicles"; and that "[r]ecords of their Instagram activities . . . are often stored on their cell phones." *Id.* at ¶¶ 9–10.

- For instance, during search warrants executed on the residence and vehicle of ETG Crips leader and unindicted co-conspirator Antoine Fordham on June 20, 2017, investigators recovered "ETG Crips gang paperwork discussing the history, rules, and code words of the gang," as well as a cell phone containing text messages

between Fordham and HALL "discussing the ETG Crips as well as acts of violence carried out in furtherance of the gang." *Id.* at ¶ 17.

- Investigators also recovered ETG Crips gang writings during a search warrant executed on SHIPLEY's residence on November 28, 2017. *Id.* at ¶ 18.

- In addition, during search warrants executed on HALL's residence and vehicle on July 31, 2019, investigators recovered handwritten notes using ETG Crips gang terminology as well as a cell phone containing hundreds of text messages between HALL, FINNEY, and other members of the gang discussing ETG Crips gang business and acts of violence carried out in furtherance of the gang. *Id.* at ¶¶ 19–20.

- For instance, on November 25, 2018, HALL texted an individual named "C" to make arrangements for FINNEY to pick up a "slammer" (*i.e.*, a gun) from "C" at the Burger King on Washington Boulevard. *Id.* at ¶ 58.

- On January 12, 2019, FINNEY texted HALL a photograph of an AR-15-style firearm and indicated that he could purchase it for $1200 from an individual named "Scrappy." HALL and FINNEY then discussed the possibility of robbing "Scrappy" of the weapon instead of making a purchase. *Id.* at ¶ 60.

- On January 24, 2019, HALL and FINNEY exchanged text messages in which they discussed enlisting the help of another Crips set to help "clean up" "the A," *i.e.*, shoot and kill their rivals on Abington Street. *Id.* at ¶ 60.

- On February 5, 2019, HALL sent text messages to FOSTER directing him to "push fin n jug" (*i.e.*, FINNEY and JOHNSON) to "put in . . . work" to avenge the death of Mitch Finney. HALL also suggested that FOSTER get a ride from FINNEY, HICKMAN, or WILLIAMS to carry out the attack. *Id.* at ¶ 54.

- On February 6 and 8, 2019, FOSTER sent HALL text messages indicating that he was looking for a "jim rod" (*i.e.*, a gun) so he could carry out acts of violence against their rivals on Abington Street, and he was taking FINNEY with him. HALL told FOSTER to "be confident," telling him he "would have the upper hand" because "them boys scared an off point" and "not expecting [sic] it." *Id.* at ¶ 62.

- On February 16, 2019, FINNEY sent HALL text messages indicating that he had pulled a gun on an member of the Abington Avenue organization named "Fry." FINNEY said, "[H]e seen the jiffy his dumb ass was shaking in his boots I was gonna slap him wit[h] that bitch but he was pleading Lik[e] a bitch." *Id.* at ¶ 63.

- On March 30, 2019, HALL and FINNEY exchanged text messages about a "hammer" (*i.e.*, gun) of HALL's that was in FINNEY's possession. FINNEY told HALL that HALL needed to come pick up the gun because FINNEY was "not tryna be riding all ova" with it. *Id.* at ¶ 64.

- On May 20, 2019, FINNEY sent HALL a text message with a photograph of a .40 caliber Taurus handgun and indicated that he could buy the weapon for $750. HALL said he needed some more "40 rounds"—*i.e.*, rounds of .40 caliber ammunition. *Id.* at ¶ 65.

- FINNEY continued to identify himself as a member of the ETG Crips in recent, publicly available Instagram posts. *Id.* at ¶ 66. Specifically, on September 17, 2020, investigators reviewed publicly available material on FINNEY's Instagram account with username "finneyxfinney." The profile picture showed FINNEY holding up three fingers to form an ETG Crips gang sign. The tagline included the words "ForevaMiTCh," which was a reference to Mitch Finney, who had been murdered by rivals on July 17, 2017. And next to the tagline were emojis of two fingers pointing toward a blue heart, which investigators knew to be an ode to the ETG Crips gang. *Id.* at ¶ 68.

- In September 2020, investigators conducted surveillance of FINNEY and his vehicle in the area of 1132 Braddish Avenue. On September 30, 2020, they saw FINNEY park his vehicle to the rear of the building, walk to the back door of the building, and use a key to enter the door. *Id.* at ¶¶ 97–99. A subpoena served to Baltimore Gas & Electric (BGE) revealed that the utilities were in the name of Ronnie Cornelius Finney, believed to be FINNEY's father. *Id.* at ¶ 100.

- Based on the foregoing, the Affiant believed that FINNEY was residing at 1132 Braddish Avenue, and that the residence would contain evidence of FINNEY's "affiliation with the ETG Crips and of the racketeering conspiracy—for instance, gang paperwork, gang paraphernalia such as blue bandanas and apparel with the Texas Rangers "T" logo, documentation regarding potential witnesses against the gang, and cell phones and electronic devices containing text messages and Instagram activity discussing the ETG Crips and acts of violence carried out in furtherance of the ETG Crips." *Id.* at ¶ 21.

This evidence established far more than a "fair probability" that evidence of the charged racketeering conspiracy would be found in FINNEY's residence. The Fourth Circuit has held "that the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the *normal inferences* of where one would likely keep such evidence." *United States v. Servance*, 394 F.3d 222, 230 (4th Cir.) (emphasis added), *vacated on other grounds*, 544 U.S. 1047 (2005); *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). Thus, warrants are to be upheld "even when the affidavit supporting the warrant contains no factual

assertions directly linking the items sought" to the place to be searched. *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005); *see also United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (magistrate judge can draw his own commonsense inferences about the likelihood that drug traffickers store drug-related evidence in their homes, whether or not it was "explicitly articulated by the applying officer").

Here, the affidavit explained that it is common practice for members of gangs to store gang paperwork, gang paraphernalia, and cell phones containing incriminating text messages and social media activity in their residences and vehicles. But it went much further, providing specific, recent examples of times when investigators had recovered these items from residences and vehicles belonging to members of the charged conspiracy. Ex. 4, at ¶¶ 9–10, 17–20. The magistrate judge certainly had a "substantial basis" to believe that the agents would find evidence of racketeering conspiracy in FINNEY's residence, including "papers" and "apparel" indicative of his association with the Crips gang," cell phones and other electronic devices "that can be used to access Instagram," "records, images and items revealing relationships between the [defendants] and their known and unknown co-conspirators," and "indicia of occupancy, residency, and ownership of the Subject Residence." Ex. 4, at 52. Indeed, the Fourth Circuit has upheld residential search warrants based on far less evidence of a nexus between the home and the crime under investigation. *See, e.g.*, *United States v. Williams*, 974 F.2d 480, 481–82 (4th Cir. 1992) (evidence of drug-trafficking found in defendant's car, combined with receipt connecting defendant to motel room, established probable cause that evidence of drug-trafficking would be found in the motel room); *United States v. Monteith*, 662 F.3d 660, 664–65 (4th Cir. 2011) (warrant established probable cause to search defendant's residence based solely on tip from ATF agent and evidence of drug dealing found in defendant's trash).

FINNEY also argues that the agents exceeded the scope of the warrant by seizing the gun and drugs, which were outside the parameters of the search warrant.  This argument, too, fails. From the upstairs rear bedroom of the house, agents recovered a digital scale with suspected heroin residue, a clear cellophane baggie containing approximately 5.2 grams of suspected heroin, a Mentos tin containing 7 clear plastic capsules of suspected heroin, a black plastic bag containing 27 loose rounds of 9mm ammunition, a green polymer 9mm caliber handgun bearing serial number PF94DV2, a green 30-round extended magazine loaded with 27 rounds of 9mm caliber ammunition, and a black magazine containing 9 rounds of 9mm caliber ammunition.  These items were in plain view within areas the agents were authorized to search, and their "incriminating character" was "immediately apparent."  *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing *Horton*, 496 U.S. at 136–37).  Accordingly, the agents were justified in seizing them, regardless whether they were specifically listed in Attachment B.

> **d.   Motion to Suppress Fruits of Search Warrant Executed on 3917 Annellen Road and on a Black Kia Sedan on October 6, 2020, by Marcus Williams (ECF 177)**

WILLIAMS has moved to suppress ETG Crips gang apparel, gang writings, photographs, and cell phones recovered from his residence (3917 Annellen Road) and vehicle (a black Kia sedan) on October 6, 2020 pursuant to the ETG Crips takedown warrant.  *See* Ex. 4.  The warrant authorized law enforcement to seize evidence of WILLIAMS' affiliation with the ETG Crips and of the racketeering conspiracy, such as gang paperwork, gang paraphernalia, cell phones, and indicia of occupancy, residency, and ownership.  *See id.* at 10, 38–39, 52.  WILLIAMS argues that the warrant failed to establish probable cause or an adequate nexus between the alleged criminal activity and the place to be searched.  ECF 177, at 3–4.  He also argues that any probable cause was stale, as the alleged criminal activity dated back to May and June of 2016.  His motion should

be denied.

The search warrant supplied ample probable cause to believe that WILLIAMS' residence would contain evidence, fruits, and instrumentalities of racketeering conspiracy. The facts supporting probable cause included the following:

- A federal grand jury had returned an indictment charging WILLIAMS with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and drug trafficking conspiracy, in violation of 21 U.S.C. § 846, Ex. 4 at ¶ 13, based on an extensive investigation involving "debriefings of cooperating witnesses; search warrants on Instagram accounts used by members of the ETG Crips (and publicly available posts); YouTube videos featuring members of the ETG Crips; historical arrests of members of the ETG Crips and seizures of drugs, guns, and gang paperwork; forensic analysis of cell phones recovered from members of the ETG Crips incident to their arrests; recorded jail calls made by and to members of the ETG Crips; a DEA-led wiretap investigation in 2017; ballistic evidence; and cell site location data for cell phones used by members of the ETG Crips," *id.* at ¶ 15

- Based on this evidence, investigators knew that "ETG Crips often keep and disseminate gang paperwork documenting the gang's history, structure, rules, and coded terminology" and that "members of the gang frequently store such gang paperwork in their residences and vehicles." *Id.* at ¶ 17.

- In addition, investigators knew that members of gangs such as the ETG Crips "commonly use cell phones and social media platforms like Instagram to facilitate their illegal activities"; that they "commonly install the Instagram 'app' on their cell phones, which they frequently . . . store in their residences and vehicles"; and that "[r]ecords of their Instagram activities . . . are often stored on their cell phones." *Id.* at ¶¶ 9–10.

- For instance, during search warrants executed on the residence and vehicle of ETG Crips leader and unindicted co-conspirator Antoine Fordham on June 20, 2017, investigators recovered "ETG Crips gang paperwork discussing the history, rules, and code words of the gang," as well as a cell phone containing text messages between Fordham and HALL "discussing the ETG Crips as well as acts of violence carried out in furtherance of the gang." *Id.* at ¶ 17.

- Investigators also recovered ETG Crips gang writings during a search warrant executed on SHIPLEY's residence on November 28, 2017. *Id.* at ¶ 18.

- In addition, during search warrants executed on HALL's residence and vehicle on July 31, 2019, investigators recovered handwritten notes using ETG Crips gang terminology as well as a cell phone containing hundreds of text messages between HALL, WILLIAMS, and other members of the gang discussing ETG Crips gang

28

business and acts of violence carried out in furtherance of the gang. *Id.* at ¶¶ 19–20.

- In February 2019, investigators executed a search warrant on Instagram accounts for several of the defendants and recovered a long chain of messages between WILLIAMS, HALL, HICKMAN, PINSON, Steve Millhouse, and others, in which they discussed a conspiracy to kill members of a rival BGF group in Lexington Terrace—namely, Albert Pittman, Shyheim Brown, and David Johnson. *Id.* at ¶ 23.

- For instance, on May 18, 2016, HALL sent a message to the group saying "to be a Tray u gotta bash a J that's how we rocking now." The affiant knew, based on extensive training and experience, that "J" is a coded reference to a member of BGF, and that HALL was saying that killing a member of BGF was a prerequisite to membership in the ETG Crips. WILLIAMS and HICKMAN then sent the group photos of their BGF targets, Pittman, Brown, and Johnson. *Id.* at ¶ 24.

- Later on May 18, 2016, HALL asked WILLIAMS whether there was a way to approach the basketball court at Lexington Terrance from "behind." WILLIAMS replied that there was. HALL said they might be able to "catch them" (*i.e.*, their BGF targets) unawares in this way. HALL asked WILLIAMS whether he was willing to "take [the] lead in a drill" that night—*i.e.*, an attempt to shoot or kill the rival BGF members. WILLIAMS replied that he was. *Id.* at ¶ 25.

- On May 19, 2016, HICKMAN sent a message to the group saying that he had just seen "Al" (*i.e.*, Pittman) and some of his associates off Cherry Blossom Way in Lexington Terrace. HALL asked, "How u keep seeing them but ain't no shotz fired[?]" HICKMAN replied that he could not "fire shots" without a "strap" (*i.e.*, a gun). WILLIAMS said it would get done; he just did not want to "waste bullets" and "hit nuffn." HICKMAN added that he was looking for opportunities "everyday" and "wen I do wat I do it a be finished." HALL agreed, "it's not shooting to be shooting we shoot to kill." *Id.* at ¶ 26.

- Based on witness accounts, jail calls, and other evidence, investigators determined that WILLIAMS, HICKMAN, and JOHNSON took part in a botched attempt to kill Albert Pittman and Shyheim Brown on June 23, 2016 near the basketball court in the 800 block of West Lexington Street. Instead, they shot David Greenwood and Anthony Owens. *See id.* at ¶¶ 30–33.

- Based on witness accounts, surveillance footage, text messages, and other evidence, investigators determined that HALL murdered Shyheim Brown and shot Tyrone Newby and Larry Moore on November 11, 2016 in the 800 block of West Lexington Street. Roughly 25 minutes after the murder, HALL sent text messages to Antoine Fordham bragging about his handiwork. HALL said he "jus bashed the monkeys" and sent Fordham a news article about the triple shooting. Investigators determined that HALL committed the shooting from the front passenger seat of a black Honda sedan belonging to Donnell FOSTER. *Id.* at ¶¶ 34–44.

- On February 5, 2019, HALL sent text messages to FOSTER directing him to "push fin n jug" (*i.e.*, FINNEY and JOHNSON) to "put in . . . work" to avenge the death of Mitch Finney. HALL also suggested that FOSTER get a ride from WILLIAMS, FINNEY, or HICKMAN to carry out the attack. *Id.* at ¶ 54.

- On September 17, 2020, investigators reviewed publicly available material on WILLIAMS' Instagram account with username "Humblebeast_GC." The profile picture was a photograph of HALL, and the tagline included the words "FREE TRAY" followed by emojis of ETG Crips gang signs. On October 1, 2020, investigators observed that WILLIAMS' username had been changed to "1hb_gc," but the profile page still included the tagline "FREE TRAY" followed by emojis of ETG Crips gang signs. *Id.* at ¶ 72.

- On May 11, 2020, investigators conducted surveillance outside 3917 Annellen Road and observed a black Kia sedan parked in the parking pad to the rear of the residence. Records from the Maryland Motor Vehicle Administration revealed that WILLIAMS was the registered owner of the vehicle. *Id.* at ¶ 78. In late September, investigators conducted surveillance and observed WILLIAMS coming and going from the residence and his black Kia sedan parked outside. *Id.* at ¶¶ 79–81.

- Based on the foregoing, the Affiant believed that WILLIAMS was residing at 3917 Annellen Road and operating the black Kia sedan, and that the residence and vehicle would contain evidence of WILLIAMS' "affiliation with the ETG Crips and of the racketeering conspiracy—for instance, gang paperwork, gang paraphernalia such as blue bandanas and apparel with the Texas Rangers "T" logo, documentation regarding potential witnesses against the gang, and cell phones and electronic devices containing text messages and Instagram activity discussing the ETG Crips and acts of violence carried out in furtherance of the ETG Crips." *Id.* at ¶ 21.

This evidence established far more than a "fair probability" that evidence of the charged racketeering conspiracy would be found in WILLIAMS' residence and vehicle. Again, the affiant explained not only that it is common practice for members of gangs to store gang paperwork, gang paraphernalia, and cell phones containing incriminating text messages and social media activity in their residences and vehicles, but also provided specific, recent examples of times when investigators had recovered these items from residences and vehicles belonging to members of the charged conspiracy. Ex. 4 at ¶¶ 9–10, 17–20. This was more than enough to establish a nexus between the items to be seized and the places to be searched. *See Servance*, 394 F.3d at 230 (4th

Cir.) ("[T]he nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."); *Anderson*, 851 F.2d at 729; *Williams*, 974 F.2d at 481–82; *Monteith*, 662 F.3d at 664–65.  The affiant was not required to include "factual assertions directly linking the items sought" to the place to be searched.  *Grossman*, 400 F.3d at 217.

Nor was the probable cause stale.  Although "time is a crucial element of probable cause," the "vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit."  *United States v. McCall*, 740 F.2d 1331, 1336 (4th Cir. 1984) (quoting *United States v. Johnson*, 461 F.3d 285, 287 (10th Cir. 1972)).  Rather, the court "must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and"—most important here—"the nature of the property to be seized."  *Id.*  As the Fourth Circuit recognized in *McCall*, even "substantial gaps" in time will not undermine probable cause if the items sought are "not ordinarily destroyed or moved about from one place to another."  *Id.* at 1336–37 (citing *United States v. Freeman*, 685 F.2d 942 (5th Cir. 1982) (bank records and identification papers); *Andresen v. Maryland*, 427 U.S. 463, 478–79, n.9 (1976) (business records); *United States v. Diecidue*, 603 F.2d 535, 560 (5th Cir. 1979) (bullet fired into wall)).  In *McCall* itself, the Fourth Circuit held that a warrant for the defendant's home was not stale despite the passage of more than two years since the robbery under investigation because a witness had seen the defendant with the robbery weapon in his home seven months earlier.  *Id.* at 1337.  It did not matter that the defendant had moved to a different home since then.  The Court reasoned: "As [the defendant] had already kept the revolver at his residence for nearly two years after the robbery when he showed it to [the witness], it was reasonable to assume that he still had it at his residence seven to nine months

later—even though his street address had changed during that interval." *Id.*

Here, although much of the criminal activity described in the affidavit occurred between 2016 and 2019, there was evidence from WILLIAMS' Instagram account that he maintained his membership in the ETG Crips and the racketeering conspiracy. As recently as October 1, 2020—just four days before the warrant was issued—WILLIAMS continued to use his Instagram profile to show support for incarcerated ETG Crips leader Trayvon HALL and display emojis of ETG Crips gang signs. Ex. 4, at ¶ 72. Indeed, a federal grand jury had returned an indictment charging WILLIAMS with a long-running racketeering conspiracy that continued through September 30, 2020. *See id.* at ¶ 13; ECF 20. Moreover, the items sought in the warrant—gang paperwork and apparel, photographs showing WILLIAMS' association with other members of the gang, and cell phones—were precisely the type of items that were likely to be kept in WILLIAMS' home or vehicle over lengthy periods of time. As in *McCall*, it was reasonable for the magistrate judge to assume that as an active member of the ETG Crips, WILLIAMS would still have gang paraphernalia and writings in his residence or vehicle many months or even years after the last known instance of his involvement in any particular act of violence.

> e.  **Motion to Suppress Fruits of Search Warrant on Two Cell Phones Seized from 3917 Annellen Road on October 6, 2020, by Marcus Williams (ECF 206)**

WILLIAMS has moved to suppress the fruits of a search warrant executed on two cell phones recovered from his residence on October 6, 2020. The warrant was issued by United States Magistrate Judge Thomas M. DiGirolamo on October 22, 2020, and it authorized law enforcement to search the cell phones for evidence of racketeering conspiracy. *See* Exhibit 5 (Cell Phone Warrant). WILLIAMS makes the same arguments regarding inadequate nexus and staleness that he made with respect to the warrant for his residence and vehicle. His motion should be denied.

The search warrant supplied ample probable cause to believe that WILLIAMS' cell phones would contain evidence of racketeering conspiracy. The probable cause statement included all the same factual material that was included in the takedown warrant for WILLIAMS' residence. It explained how gang members commonly use cell phones (and social media platforms installed on their cell phones) to further their criminal activities. *Id.* at ¶¶ 9–10. It provided specific, recent examples of times when investigators had recovered cell phones from members of the charged racketeering conspiracy that contained text messages and Instagram messages discussing ETG Crips business and acts of violence committed in furtherance of the gang. *Id.* at ¶¶ 17–20. It provided dozens of examples of these text messages and Instagram messages, including many involving WILLIAMS himself. *Id.* at ¶¶ 23–29, 35–37, 47–48, 54, 56–65. And it explained that WILLIAMS had recently used his Instagram profile to show support for incarcerated ETG Crips leader Trayvon HALL and display emojis of ETG Crips gang signs. *Id.* at ¶ 72.

In addition to all this information, the affidavit explained that, during the takedown warrant executed at 3917 Annellen Road on October 6, 2020, investigators located WILLIAMS, his significant other, Alexis Spell, and a minor child in the residence. *Id.* at ¶ 83. They recovered the two subject cell phones from WILLIAMS' bedroom and adjacent bathroom. *Id.* at ¶¶ 84–85. From the closet of WILLIAMS' bedroom, investigators recovered "handwritten notes and letters that used Crips code language and terminology, as well as a blue hat with the Texas Rangers "T" logo, embroidered with "E.T.G." on the right side of the hat and "BACC WEST" on the back of the hat, which investigators recognized as ETG Crips gang paraphernalia." *Id.* at ¶ 84. They also found mail addressed to WILLIAMS at 3917 Annellen Road in the home. *Id.* at ¶ 86. The only other adult occupant of the residence—Ms. Spell—had her own cell phone on her person during the search. *Id.* at ¶ 87. Therefore, investigators reasonably believed that the subject cell phones

belonged to WILLIAMS, and that they would contain evidence of WILLIAMS' "affiliation with the ETG Crips and of the racketeering conspiracy—for instance, records of text messages and Instagram activity discussing the ETG Crips and acts of violence carried out in furtherance of the ETG Crips." *Id.* at ¶ 103.

<blockquote>

**f.   Motion to Suppress Fruits of February 22, 2019 Search Warrant on Instagram Account with Username "mitch_3rdst_way," by Ronnie Finney (ECF 196)**

</blockquote>

FINNEY has moved to suppress the fruits of a search warrant executed on his Instagram account with username "mitch_3rdst_way." The warrant was issued by United States Magistrate Judge Beth P. Gesner on February 7, 2019, and it authorized agents to search the account records for evidence of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), among other crimes. *See* Exhibit 6 (Instagram Warrant). FINNEY argues that the affidavit "did not include enough facts to establish a substantial basis for the finding of probable cause that a nexus existed between the alleged criminal activity, the account to be searched, and the things to be seized." ECF 196, at 1. FINNEY's motion should be denied.

The search warrant supplied ample probable cause to believe that FINNEY's Instagram account would contain evidence of racketeering conspiracy. The facts supporting probable cause included the following:

- The affiant, FBI TFO Mark Neptune, knew, based on extensive training and experience, that "individuals involved in drug trafficking and criminal gangs frequently use social media platforms like Instagram to further their illegal activities." Ex. 6 at ¶¶ 22–23. TFO Neptune also knew that members of the ETG Crips in particular "frequently use Instagram to promote their drug trafficking activities, assert their claim to particular drug shops or territories, intimidate witnesses or rival drug traffickers, enhance the status of the [gang], or enhance their own status within [the gang]." *Id.* at ¶ 26.

- Investigators reviewed publicly available material on Instagram accounts belonging to ETG Crips leader Trayvon HALL and other members of the gang. These accounts contained photographs depicting HALL, FOSTER, JACKSON, PINSON,

and others wearing ETG Crips gang apparel and/or flashing ETG Crips gang signs or tattoos.  *Id.* at ¶¶ 28, 35–36, 38, 41–42, 47–51, 53–54.  FOSTER's account also contained a recently posted video in which FOSTER rapped about killing an individual who cooperated against the gang.  *Id.* at ¶ 37.

- A confidential source told investigators that FINNEY and Trayvon HALL were responsible for murdering Theron McClary, a/k/a "Booby," a member of the rival Abington Avenue drug trafficking organization, on Abington Avenue in August 2017.  *Id.* at ¶ 56.  The confidential source also stated that FINNEY used to sell drugs in the area of Baltimore Street and Hilton Avenue (which investigators knew to be drug territory of the ETG Crips, *see id.* at ¶¶ 24–25).

- FINNEY had been convicted of distributing narcotics in November 2010, and of CDS Possession of Firearms in November 2013.  *Id.* at ¶ 56.

- Investigators identified the account with username "mitch_3rdst_way" as FINNEY's because the profile picture associated with the account was a photograph of FINNEY, and the username included a reference to Mitch Finney, who had been murdered by gang rivals on July 17, 2017, as well as a reference to the ETG Crips ("3rdst" is shorthand for the "Tray" in Eight Tray Gangster Crips).  *Id.* at ¶ 55.

- Although the contents of FINNEY's account were private, investigators discovered evidence of FINNEY's membership in the racketeering conspiracy on the publicly available portions of Instagram accounts belonging to other subjects of the investigation.  For example, Deon Finney's account included a photograph posted on January 7, 2017, in which Ronnie FINNEY was depicted standing at the corner of Baltimore Street and Hilton Avenue with other members of the gang, some of whom were flashing ETG Crips gang signs.  Deon Finney's account also included a photograph posted on May 23, 2017, in which Ronnie FINNEY was depicting standing next to Mitch Finney, both of whom were flashing ETG Crips gang signs.  *Id.* at ¶ 57.

These facts established far more than a "fair probability" that evidence of racketeering conspiracy would be found in FINNEY's Instagram account.  The profile name alone, in which FINNEY expressly identified as "3rdst," provided a clear indication that the account would contain evidence of FINNEY's affiliation with the ETG Crips and his involvement in the conspiracy.  And the photographs of FINNEY flashing ETG Crips gang signs that were posted to his co-conspirators' accounts made this conclusion more certain.  The affidavit also included a lengthy description of the numerous ways in which individuals involved in criminal gangs use social media

platforms like Instagram to further their illegal activities, and provided concrete, recent examples of such use by members of the ETG Crips.  Nothing more was required. *See Servance*, 394 F.3d at 230; *Grossman*, 400 F.3d at 217; *Anderson*, 851 F.2d at 729; *Williams,* 548 F.3d at 319.

### 3.   The Officers Relied on the Warrants in Good Faith

Under the *Leon* good faith exception, "a court should not suppress the fruits of a search conducted under the authority of a warrant, even a subsequently invalidated warrant, unless a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002).  Officers are presumed to have acted in good faith except in certain narrowly defined circumstances: "(1) if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate wholly abandoned his judicial role…(3) if the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) if under the circumstances of the case the warrant is so facially deficient…that the executing officers cannot reasonably presume it to be valid." *United States v. DeQuasie*, 373 F.3d 509, 519–20 (4th Cir. 2004).

Even if the court has doubts about the quantum of probable cause supporting any of the warrants discussed above, the motions to suppress should be denied because in each case, the executing officers relied in good faith on a facially valid warrant.  *Leon*, 486 U.S. 897.  There is no suggestion that the issuing judges were anything but neutral and detached, *see Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–27 (1979), or that they were misled by information in the affidavit that the affiants knew was false or would have known was false except for their reckless disregard of the truth, *see Franks v. Delaware*, 438 U.S. 154 (1978).  Moreover, the affidavits contained

"sufficient indicia of probable cause so as not to render reliance on [them] entirely unreasonable." *Bynum*, 293 F.3d at 197–99; *United States v. Clutchette*, 24 F.3d 577, 582 (4th Cir. 1994). Indeed, the Fourth Circuit has applied the *Leon* good faith exception to the exclusionary rule in circumstances where the statement of probable cause was far more bare bones than the ones at issue here. *See, e.g.*, *United States v. Williams*, 548 F.3d 311 (4th Cir. 2008) (bare assertion that the targeted dwelling was known to be the defendant's, without explaining how); *United States v. Harris*, 215 Fed. Appx. 262, 272 (4th Cir. 2007) (unpub.) (no indication that the defendant lived in the targeted premises, let alone grounds for believing so).

### C.  Motions to Suppress Custodial Statements

FINNEY, HICKMAN, JOHNSON, and WILLIAMS have filed motions to suppress various statements they made to law enforcement. They assert their general right against self-incrimination under the Fifth Amendment and their right to a hearing to determine the voluntariness of any custodial statement that the government seeks to admit as evidence at trial.[7]

We begin with a statement of the applicable law. We then describe the statements made to law enforcement by the above-named defendants that the government intends to use in its case in chief. Finally, we explain why all these statements are voluntary and admissible.

### 1.    Applicable Law

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In order to protect this right, the

---

[7]    FINNEY has moved to suppress "any and all statements, admissions and confessions" without limitation, which would include non-custodial statements made in recorded jail calls and wire calls, or statements made to co-conspirators.  ECF 188, at 1; ECF 195, at 1, 3.  He has not identified any particular non-custodial statements he seeks to suppress, or made any colorable claims for the suppression of non-custodial statements.  Therefore, to the extent the defendant is seeking suppression of non-custodial statements, his motion should be denied.

Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) adopted prophylactic procedural rules that must be followed in custodial interrogations. *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001). In general, any statements elicited from a suspect without first advising the suspect of his rights to remain silent and to counsel are inadmissible in the prosecution's case-in-chief. *Id.* An individual is "in custody" for *Miranda* purposes when, under the totality of the circumstances, "a suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). "Interrogation" for *Miranda* purposes means "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). On the other hand, "volunteered statements"—that is, statements "given freely and voluntarily without any compelling influences"—"are not barred by the Fifth Amendment and their admissibility is not affected by" the Supreme Court's holding in *Miranda*. *Miranda*, 384 U.S. at 478. In addition, there is an exception to the *Miranda* requirement when officers ask routine booking questions intended to gather "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (background questions regarding defendant's name, place of birth, address, and length of time residing in town did not constitute interrogation for *Miranda* purposes).

Statements made after a *Miranda* waiver must also be voluntary. The Supreme Court has held that "[c]oercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also United States v. Cristobal*, 293 F.3d 134, 140 (4th Cir. 2002). Examples of coercive police activity include prolonged detention and interrogation without sleep or rest, administration of "truth serums," physical abuse, and threats of physical abuse. *See Cristobal*, 293 F.3d at 140. "The mere existence of threats,

violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc).  Rather, "[t]he proper inquiry 'is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired'" by police conduct.  *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *see also Braxton*, 112 F.3d at 780.  In applying this test, "courts must consider the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.'" *Braxton*, 112 F.3d at 780 (quoting *Pelton*, 835 F.2d at 1071).  Ordinarily, courts do not suppress post-*Miranda* statements unless they are "coerced confessions procured by means 'so offensive to a civilized system of justice that they must be condemned.'"  *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)).

### 2.   Relevant Facts

#### a.   Statements by Ronnie FINNEY on October 6, 2020 (ECF 195)

On October 6, 2020, at approximately 6:00 a.m., agents executed a federal search warrant at 1132 Braddish Avenue in Baltimore.  Present inside the residence were FINNEY, a female, and two children.  Agents advised both FINNEY and the female of their *Miranda* rights.  Both acknowledged that they understood their rights as read to them.  Agents brought FINNEY outside to be transported to the FBI's Baltimore headquarters.  Once outside, agents asked FINNEY if there was anything illegal in the house.  FINNEY replied, "Yeah, there's a little pistol upstairs." FINNEY was then transported to the FBI's Baltimore office by Task Force Officer (TFO) David Bahr and Special Agent Kevin McCann.

Upon arriving at the FBI office, FINNEY was placed in an interview room equipped for audio and video recording.  Agents sat FINNEY at a table with one hand cuffed to the wall. FINNEY slept or tried to sleep until TFO Mark Neptune entered the room at approximately 7:30 a.m., at which time he offered FINNEY water, and escorted him to the restroom.  FINNEY, TFO Neptune, and Special Agent Rego returned a few minutes later, and FINNEY resumed his seat, uncuffed.  TFO Neptune asked routine booking questions of FINNEY such as his age, education, date of birth, physical descriptors, social security number, and whether he was under the influence of any drugs or alcohol.  FINNEY replied that he last used heroin "late last night" and "fell asleep," and that it was "probably still in [his] system."  However, FINNEY appeared alert and lucid and did not show visible signs of being under the influence of drugs or alcohol or suffering from withdrawal symptoms.

TFO Neptune asked FINNEY if he was advised of his rights "on scene."  FINNEY nodded and replied, "mm-hmm."  TFO Neptune proceeded to read FINNEY his *Miranda* rights again from the FBI Advice of Rights Form.  TFO Neptune gave the form to FINNEY to review, and FINNEY read the form and signed it directly underneath the statement, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  Exhibit 7 (Finney Miranda Waiver).  FINNEY acknowledged that he told officers on scene for the search warrant that there was a gun in an upstairs closet.  When asked by TFO Neptune where the gun came from, FINNEY explained that he received it from Deonte Emmons' girlfriend after Emmons was killed.  When asked if there was "a body" on the gun, FINNEY paused and stated, "to be honest, I don't know, I think it's clean."  FINNEY answered questions about the murder of Deonte Emmons a/k/a Tip, Christopher Hockaday, and Mitch

Finney.  FINNEY admitted that he sold weed and sometimes carried the gun on him.  FINNEY acknowledged knowing HALL as a long-time member of the ETG Crips.

During the interview, FINNEY and the agents spoke in a low volume and conversational tone as they sat across from one another at the table.  FINNEY was attentive and spoke coherently. At the conclusion of the interview, which was at approximately 9:42 a.m., the agents again offered FINNEY water and food.  At no point did the agents make any threats or promises to induce FINNEY to talk to them.

### b.    Statements by Daran HICKMAN on October 6, 2020 (ECF 193)

On October 6, 2020, at approximately 6:00 a.m., agents executed a federal search warrant at 2920 Grantley Avenue, Baltimore.  Present inside the residence were HICKMAN, a female, and a young child.  Agents placed HICKMAN under arrest, and Special Agent Draper read the FBI Advice of Rights form aloud to HICKMAN, who acknowledged that he understood his rights. Special Agent Paniwozik and TFO Barnwanijakul transported HICKMAN to the FBI office in Baltimore.  At approximately 7:17 a.m., agents placed HICKMAN in an interview room equipped with audio and visual recording.  Agents provided HICKMAN with water and food as soon as he was brought into the interview room.  HICKMAN was seated at a table and handcuffed to the wall with one hand.  HICKMAN remained in the interview room alone for a period of time, falling asleep at various times.  At approximately 9:58 a.m., Special Agent Rego and TFO Neptune entered the interview room, introduced themselves, and removed the handcuffs from HICKMAN. HICKMAN acknowledged that he had been advised of his rights on scene.  TFO Neptune once again advised HICKMAN of his *Miranda* rights at 10:03 a.m. using the FBI Advice of Rights form.  Exhibit 8 (Hickman Miranda Waiver).  HICKMAN then read the form on his own and

signed it, acknowledging that he understood his rights and agreed to speak with investigators without a lawyer present.

HICKMAN acknowledged being a long-time member of the ETG Crips, identified other members of the gang through photographs, and admitted that they sold "ready" (*i.e.*, crack cocaine). HICKMAN also answered questions about the murders of Shyheim Brown and Albert Pittman. During the interview, HICKMAN was given a restroom break and additional food. The interview concluded at approximately 11:54 a.m. At no point did the agents make any threats or promises to induce HICKMAN to speak with them.

### c. Statements by Marcus WILLIAMS on October 6, 2020 (ECF 176)

On October 6, 2020 at approximately 6:00 a.m., agents executed a federal search warrant at 3917 Annellen Road, Baltimore. Located inside the residence were WILLIAMS, his fiancée, Alexis Spell, and an infant. Agents advised both WILLIAMS and Spell of their *Miranda* rights out loud using the FBI Advice of Rights form. Both WILLIAMS and Spell acknowledged having been advised of their rights. Agents asked WILLIAMS if Spell could sign the Advice of Rights form on his behalf since he was handcuffed at the time. WILLIAMS agreed, and Spell signed the form. WILLIAMS was placed under arrest and transported to the FBI office in Baltimore by Special Agent Patrick Noonan and TFO Mark Williams.

At approximately 7:39 a.m., WILLIAMS was seated at a table with a bottle of water and chips and one hand cuffed to the wall. He fell asleep for a period of time. Agent Rego and TFO Neptune entered the interview room at approximately 12:21 p.m. and uncuffed WILLIAMS. They took biographical information from WILLIAMS, who stated that he was sober. TFO Neptune confirmed that WILLIAMS had been advised of his *Miranda* rights "on scene" and that he understood his rights. Agent Neptune also confirmed that WILLIAMS' fiancée, Alexis Spell, had

signed the FBI Advice of Rights *Miranda* form on WILLIAMS' behalf since he was handcuffed. Agent Neptune then gave the form to WILLIAMS to review and sign for himself. WILLIAMS signed the form under Spell's signature, acknowledging that he understood his rights and agreed to answer questions without a lawyer present. Exhibit 9 (Williams Miranda Waiver). TFO Neptune again explained that they would ask him some questions, and if at any point he did not want to talk to them, he could simply ask for a lawyer or say he did not want to answer any more questions.

WILLIAMS was shown photographs of some of his co-defendants and identified them. He acknowledged using the Instagram name humble_keeway. He also made a number of false exculpatory statements; for instance, he denied being a member of the Crips gang, denied ever possessing a gun, and denied knowledge of any murders. At approximately 1:02 p.m., the agents concluded the interview and left the room, and WILLIAMS went to sleep. WILLIAMS told the detectives that he takes medication for anxiety, but during the interview he appeared relaxed, calm, alert, and coherent in his responses.

### d.    Statements by Alvin JOHNSON on October 6, 2020 (ECF 190)

On October 6, 2020, at approximately 6:00 a.m., agents executed a federal search warrant at 3711 Ridgecroft Road in Baltimore. The residence was occupied by JOHNSON and a female. At 6:28 a.m., Special Agent Douglas Eadie verbally advised JOHNSON of his *Miranda* rights, and JOHNSON acknowledged that he understood them. Shortly thereafter, Special Agents Eadie and Bartlett transported JOHNSON to the FBI's Baltimore office. At approximately 7:59 a.m., JOHNSON was placed in an interview room equipped with audio and visual recording. Agents seated JOHNSON at a table and handcuffed him with one hand to the wall. Agents provided JOHNSON with water and snacks. JOHNSON asked for a piece of gum, joking with agents about

43

being up so early and not brushing his teeth.  JOHNSON appeared relaxed and comfortable, even

offering his snack to one of the agents.  He engaged in small talk with the agents for about 30

minutes, and then tried to fall asleep in various positions.

Special Agent Rego entered the interview room at approximately 1:26 p.m. and escorted

JOHNSON to the bathroom.  JOHNSON's handcuffs were removed upon returning to the room.

At approximately 1:28 p.m., TFO Neptune took basic biographical information from JOHNSON.

TFO Neptune confirmed that JOHNSON was sober and that he had been advised of his rights "on

scene."   JOHNSON added, "You can read them again."   TFO Neptune read the *Miranda*

advisements from the FBI Advice of Rights form to JOHNSON for a second time at 1:33 p.m.

JOHNSON read the advisement at the bottom of the form and signed it, acknowledging that he

understood his rights and agreed to speak with investigators without a lawyer present.  Exhibit 10

(Johnson Miranda Waiver).  JOHNSON asked, "You said you're going to ask me questions?" to

which TFO Neptune replied, "Yes, and again, if at any point you don't want to answer questions,

just say you want a lawyer or you don't want to answer questions and we won't ask you anymore."

JOHNSON then asked what he was being charged with, and TFO Neptune told him that he was

charged in a racketeering conspiracy.

JOHNSON admitted that he joined the ETG Crips when he was 15 years old and that he

sold weed in the past.  Agents showed JOHNSON photos of others whom he identified as Crips

members.  JOHNSON answered some questions about acts of violence in the Lexington Terrace

neighborhood in 2016.  He also made some false exculpatory denials.  The interview concluded at

approximately 2:01 p.m., when JOHNSON said he did not want to answer any more questions.

### 3.    The Defendants' Statements Followed Valid *Miranda* Waivers

All of the defendants' statements were preceded by a proper *Miranda* advisement and a

knowing and voluntary waiver of those rights.  Indeed, all of them were advised of their *Miranda* rights multiple times.  After being properly advised, each defendant indicated that he understood his rights and agreed to answer questions.  At no time did the police make any threats or promises to induce the defendants to waive their rights.

Only JOHNSON makes a specific argument challenging the validity of his *Miranda* waiver.  JOHNSON alleges that his *Miranda* rights were read to him in a "perfunctory fashion" and that the agents did not "elicit an affirmative response from him as to whether he understood his rights."  ECF 190, at 3.  JOHNSON's characterization of the *Miranda* advisement does not jibe with the video.  The video shows that at the outset of the interview, the agents confirmed that JOHNSON had received *Miranda* warnings earlier that morning at his house; re-read the *Miranda* advisement to him a second time; and clarified that if at any point JOHNSON did not want to answer questions, he could simply say he wanted a lawyer.  JOHNSON then signed the *Miranda* form, acknowledging that he understood his rights and agreed to speak with investigators without a lawyer.  A *Miranda* waiver need not be express, but may be implied from the defendant's actions and words.  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  The Fourth Circuit has held that in order "[t]o effectuate a waiver of one's *Miranda* rights, a suspect need not utter any particular words."  *United States v. Umana*, 750 F.3d 310, 344 (4th Cir. 2014) (quoting *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000)).  Rather, "[a] suspect impliedly waives his *Miranda* rights when he acknowledges that he understands the *Miranda* warning and subsequently is willing to answer questions."  *Id*. at 344 (citing *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996)).  That is exactly what happened here: JOHNSON signed the *Miranda* form, acknowledging that he understood his rights, and then agreed to speak with investigators.

JOHNSON also claims that he did not realize that his statements would be used against

him until "part way through the interview." ECF 190, at 3. According to JOHNSON, when he

asked whether his statements would be used against him and was told that he would, he "realize[d]

what transpired and invoke[d] his right to remain silent." ECF 190, at 3. Again, the video tells a

different story. JOHNSON did not ask whether his statements would be used against him. Rather,

the question JOHNSON asked of TFO Neptune was: "What am I being charged with—can you

explain racketeering and all that, what that carry?" TFO Neptune explained the nature of the crime,

the conspiracy, and the enterprise. JOHNSON then asked whether he had already been charged

"for this stuff," and when TFO Neptune confirmed that he had, JOHNSON said he did not want to

answer any more questions. JOHNSON had the right to change his mind and invoke his right to

silence at any point during the interview, as TFO Neptune explained at the outset. JOHNSON's

decision to invoke his right to silence is not evidence that he failed to understand his rights. Rather,

it showed that JOHNSON *did* understand his rights, that he was careful and deliberate in choosing

whether to answer the agents' questions, and that, after considering the topics discussed with the

agents and what they told him about their two-year-long investigation into his gang, he no longer

felt it was in his best interest to speak with them.

### 4.   The Defendants' Statements Were Voluntary

All the statements at issue were voluntary. There are no circumstances indicating that any

defendant's "will [was] overborne or [that] his capacity for self-determination [was] critically

impaired." *Braxton*, 112 F.3d at 780 (quoting *Pelton*, 835 F.2d at 1071). As discussed above,

each defendant was legally detained and properly advised of his rights—in most cases, more than

once. In each case, the police were cordial and professional; they did not make threats or promises

or otherwise engage in coercive conduct. *See Connelly*, 479 U.S. at 167 ("[C]oercive police

activity is a necessary predicate to the finding that a [statement] is not 'voluntary' within the

meaning of the Due Process Clause."). All the defendants were allowed to sleep while waiting for the interview to begin and were provided food and drink. In no instance did agents continue questioning after a defendant requested that the interview be stopped. This is not a case where law enforcement officers "attempted to 'wring[] a confession out of an accused against his will,'" *Cristobal*, 293 F.3d at 141 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 206–07 (1960)), or "went to extraordinary lengths to extract from [the defendant] a confession by psychological means," *Braxton*, 112 F.3d at 786 (quoting *Ferguson v. Boyd*, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam)).

Only FINNEY and HICKMAN make specific arguments regarding the voluntariness of their admissions. FINNEY argues that TFO Neptune induced him to talk by commenting that FINNEY "ha[d] a lot to lose" and falsely implying that FINNEY could have a place in his children's lives if he waived his right to remain silent and incriminated himself. ECF 195, at 1–2. This claim is meritless. At approximately 8:03 a.m., roughly half an hour *after* FINNEY waived his *Miranda* rights and began talking to TFO Neptune about a host of topics, including the ETG Crips and different murders, TFO Neptune said:

> Right now you're charged with racketeering, which includes a lot of murders in it. You're facing potentially life in jail, okay? You're record is not great. You have a lot to lose. We do see that you are a family man; we've been following you a long time. You do take care of your kids. Alright? Your kids are young. It's going to be up to you whether or not you have a spot in their life. I do think you were getting pressure to retaliate. I know you were more involved than you're letting on. But this is your point where you get ahead of it, or get run over by it. Because I'm telling you, people are not taking this laying down. People are not trying to go to jail for the rest of their life for no "bulletproof loyalty" bullshit. You feel me?

FINNEY nodded and continued to review photographs shown to him by TFO Neptune. FINNEY remained engaged in the conversation, never asking to terminate the interview. TFO Neptune was frank with FINNEY in detailing the investigation and the evidence gathered, and TFO Neptune

accurately laid out FINNEY's predicament.  As the Fourth Circuit has held, "[t]ruthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782 (quoting *Pelton*, 835, F.2d at 1073) (officer's truthful statement that defendant could get five years in prison for false statements if he did not "come clean" was not a threat that rendered defendant's confession involuntary); *see also United States v. Mitchell*, 514 F. App'x 319, 322 (4th Cir. 2013) (officer's truthful statement that defendant's girlfriend might lose custody of her children if the drugs and firearms in their shared residence were attributed to her did not affect the voluntariness of defendant's confession); *United States v. Savage,* 161 Fed. App'x. 256 (4th Cir. 2006) (officer's truthful statement that "everyone in the house could be arrested if any guns or illegal narcotics were found" was "not sufficient to render [the defendant's] statement involuntary").

It is also significant that FINNEY was 34 years old with a high school equivalency degree and a lengthy criminal history.  He had received *Miranda* warnings over a dozen times and was well aware of his rights.  There is no evidence to suggest that his will was overborne by TFO Neptune's accurate assessment of what FINNEY was facing with respect to the racketeering charges or his suggestion that cooperation would lead to a more lenient sentence.  There is also no evidence to support FINNEY's claim that the agents had "knowledge that Mr. Finney was craving heroin." ECF 195, at 2.  Although FINNEY stated that he had used heroin the previous night and that it was probably still in his system, there were no visible signs that he was under the influence or suffering from withdrawal symptoms.[8]  He listened attentively to TFO Neptune.  His responses

---

[8]     At approximately 8:55 a.m., roughly an hour and a half into the interview, while discussing a series of jail calls in which FINNEY arranged to smuggle drugs into the jail for another person, FINNEY commented, "I'm sick right now."  However, he went right on answering questions lucidly and intelligently.  He never told the agents he was craving heroin.

were thoughtful and articulate.  FINNEY knowingly and voluntarily waived his rights by agreeing to speak with detectives and continuing to do so over the course of two hours.[9]

HICKMAN argues that his will was overborne because he was "interrogated by law enforcement officers for over two hours" and because law enforcement made erroneous statements regarding his involvement in the alleged conspiracy and the penalties he faced.  ECF 193, at 1–2. These claims also fail.  After reviewing the FBI Advice of Rights form with HICKMAN, the agents explained that they worked on a gang task force and that they had spent the last two years investigating the ETG Crips.  HICKMAN was very talkative and extremely articulate during the interview, acknowledging at the outset that he was a member of the Crips gang.  The agents discussed several matters with HICKMAN, including the murder of Albert Pittman, a topic raised over 25 minutes into the interview.  Agents reviewed text messages with HICKMAN about the crime, and HICKMAN provided some details about the crime.  The agents accurately explained to HICKMAN that even if he did not pull the trigger, "when it comes to racketeering, when you know about the murder and help line it up, you're just as culpable."  HICKMAN replied, "I understand."  The interview continued with HICKMAN looking at photos and answering questions in a cordial and conversational way.  HICKMAN was 28 years old with a high school education. He indicated that he was sober at the time of the interview, and he appeared lucid and coherent. There is zero evidence to support a claim that HICKMAN's will was overborne simply because

---

[9]     Even if FINNEY was suffering from heroin withdrawal, it would not render his statement involuntary.  The Fourth Circuit has held that "a deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a [*Miranda*] waiver involuntary." *Cristobal*, 293 F.3d at 141 (statement taken from defendant on narcotic painkiller the morning after surgery, but who appeared to be lucid, held voluntary).  Instead, the inquiry focuses on whether "police overreaching occurred" or "law enforcement officials exploited [the defendant's] weakened condition with coercive tactics." *Id.*  Here, FINNEY appeared to be lucid, and there is nothing to support a claim that the police exploited FINNEY's condition in any way.

the agent accurately stated the law with respect to the charged racketeering offense.  Again, "[t]ruthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782; *see also Mitchell*, 514 F. App'x at 322; *Savage,* 161 Fed. App'x 256.

The length of HICKMAN's detention also does not render his statement involuntary. Although HICKMAN was held for close to three hours before the interview began, the delay was attributable to the length of time it took the agents to complete several search warrants and question other arrestees, and was not a tactic designed to coerce HICKMAN into providing a statement. *See United States v. Abraham*, 213 F. App'x 240, 249 (4th Cir. 2007) (roughly three-hour delay was not "significant in any way" where defendant was interviewed "as soon as the search of the residence was complete").  Moreover, HICKMAN slept while waiting for the interview to begin, and he was provided with food and water.  He was very talkative with the agents and never expressed a desire to stop the interview or indicated that he was too tired to continue.  He does not, and cannot, point to any evidence that the passage of time caused his will to be overborne. Accordingly, his statements were voluntary.

In sum, the custodial interviews in this case were routine, cordial, and free from improper police influence.  All the statements at issue were preceded by valid *Miranda* waivers.  And in each case, the totality of the circumstances weighs heavily in favor of a finding of voluntariness. Accordingly, the defendants' motions should be denied.

**D.   Motions to Suppress Fruits of Warrantless Searches, by David Jackson (ECF 204), and Ronnie Finney (ECF 198)**

Defendants JACKSON and FINNEY have filed motions to suppress evidence obtained pursuant to various warrantless arrests and searches.  JACKSON moves to suppress evidence obtained as a result of "warrantless law enforcement searches and/or seizures related to incidents

on the following dates: February 12, 2010, May 20, 213, February 19, 2014, July 16, 2014, January 17, 2017, February 14, 2017, and September 7, 2017." ECF 204, at 1.  He makes only the vague, conclusory assertion that "searches and seizures conducted on the above dates were not supported by adequate reasonable suspicion or probable cause." *Id.*  FINNEY asserts that he "was stopped and/or searched . . . on or about the following dates: August 15, 2008; January 14, 2010; January 20, 2010; November 23, 2010; July 9, 2011; and July 26, 2013." ECF 198, at 1.  He "challenges the reasonableness of each of these stops and/or searches and moves to suppress all evidence, tangible and otherwise, that resulted therefore." *Id.*  Neither JACKSON nor FINNEY identifies any particular law enforcement action they believe was unlawful or explains why they believe evidence was obtained in violation of their rights.  These motions should be denied.

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. *See United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.") (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)); *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) ("The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant.") (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980)); *United States v. Pollins*, 145 F. Supp. 3d 525, 538 (D. Md. 2015) (Quarles, J.); *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014); *United States v. Freeman*, 61 F. Supp. 3d 534, 536 (E.D. Va. 2014); *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).  Only once the defendant has established a basis for his motion to suppress does the burden shift to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence.  *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *Pollins*, 145 F. Supp. 3d at 538; *Hunter*, 63 F. Supp. 3d at 619; *Freeman*, 61 F. Supp. 3d at 536.

In order to meet his initial burden of proof, a defendant moving to suppress evidence must submit a memorandum "setting forth the reasoning and authorities in support of" the motion. District of Maryland Local Rule 105(1); *see also United States v. Hickok*, 481 F.2d 377, 378–79 (9th Cir. 1973) (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity").  Boilerplate, vague, or conclusory allegations will not suffice.  *See United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality.  Reliance on vague, conclusory allegations is insufficient."); *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (affirming denial of motion to suppress, finding that the defendant had "not fulfilled his burden of establishing a basis for his motion" because he "offered nothing but conclusory allegations that [the] authorities may have acted improperly" in obtaining the evidence at issue); *United States v. Edmonds*, 438 F. Supp. 3d 689, 693 (S.D.W. Va. 2020) (denying defendant's motion to suppress evidence seized during various searches because it was based on "bare, conclusory allegations" and did not "permit either the United States or the Court to meaningfully address the motion or prepare for a hearing, as it does not identify any specific deficiency or area of potential factual dispute").

Here, the defendants have not explained why the stops and searches at issue were unlawful. They have not even identified any particular evidence they seek to suppress.  They do not point to any factual disputes with the government or include a case-specific discussion of legal authorities pursuant to which they seek relief.  The government is left in the difficult position of having to guess about the issues to which it should respond and what evidence will need to be presented at the motions hearing.  Accordingly, the government respectfully submits that the defendants have not met their initial burden of proof, and the Court should either deny the motions or require the

defendants to supplement their filings and provide a clear explanation of the grounds for suppression that enables the government to fully respond.

**E.    Motion to Reveal Identities of Informants, by Alvin Johnson (ECF 191)**

JOHNSON seeks an order from the Court requiring the government to identify any "informants" or "cooperating criminals" "used by the government to build their case," as well as "any information regarding . . . the basis for their reliability." ECF 191.  Relying on *Roviaro v. United States*, 353 U.S. 53 (1957), JOHNSON argues that the government is required to disclose an informant's identity where the informant "actively participated" in the crimes underlying the prosecution. ECF 191, at 2.  This motion should be denied.

Crucially, the *Roviaro* line of cases deals with *non*-testifying informants.  *Roviaro* held that, in certain limited circumstances, the government may be required to disclose an informant's identity if the informant was a "participant" in a charged criminal transaction, and if the informant's identity is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 61.  The classic example is the situation where an informant conducts a controlled purchase of drugs or guns from the defendant that serves as the basis for the prosecution.  *See id.* at 64–65 (disclosure required where the informant set up the drug purchase later charged and was the sole witness to its execution).  Here, JOHNSON is not charged with any drug or gun transactions set up or initiated by informants.  The witnesses against JOHNSON will testify at trial, and he will have a chance to confront and cross-examine them.

The Fourth Circuit has held that the statements of co-conspirators whom the government intends to call as witnesses are governed by the Jencks Act, 18 U.S.C. § 3500, rather than Federal Rule of Criminal Procedure 16(a)(1)(A).  *See United States v. Roberts*, 811 F.2d 257, 258–59 (4th Cir. 1987).  The Jencks Act provides that statements made by prospective government witnesses

may not be the subject of subpoena, discovery, or inspection until after that witness has testified on direct examination at trial.  *See* 18 U.S.C. § 3500(a); *United States v. Lewis*, 35 F.3d 148, 151 (4th Cir. 1994) ("The district court may not require the government to produce Jencks Act material relating to one of its witnesses until *after* the witness has testified.") (emphasis in original).

The Jencks Act was initiated "out of concern for witness intimidation, subornation of perjury, and other threats to the integrity of the trial process."  *See, e.g.*, *United States v. Tarantino*, 846 F.2d 1384, 1417 (D.C. Cir. 1988).  Those concerns are particularly acute in this case, where the indictment alleges numerous instances in which the defendants have threatened to retaliate against suspected witnesses and informants against them.

As the Fourth Circuit has noted, "nothing in the Jencks Act prevents the government from voluntarily disclosing covered material prior to trial."  *Lewis*, 35 F.3d at 151.  Here, the government has agreed to provide Jencks material—including payments, promises of immunity, and other impeachment evidence—no later than one week before trial.  *See* ECF 122, at 5.  The government believes this agreement strikes the right balance between protecting against witness tampering and obstruction of justice, on the one hand, and allowing defense counsel adequate time to prepare for cross-examination such that trial runs smoothly and without delay, on the other.  *Compare United States v. Howard*, 811 F.2d 1505, 1507 (4th Cir. 1987) (finding no error in allowing disclosure of four-page witness statement until day of witness's cross examination and noting that the "[t]he [Jencks] Act required nothing more than that the defendants be given time to incorporate information gleaned from the written statement of the government witness into their cross-examination of that witness"); *with United States v. Holmes*, 722 F.2d 37, 40 (4th Cir. 1983) (summary order) (new trial granted where the trial court did not allow sufficient time for defense to review an eight-inch stack of Jencks material provided on the day before trial began).

Insofar as JOHNSON seeks identification of the government's witnesses and disclosure of their Jencks material, his request runs counter to the Jencks Act, the parties' agreement, and the settled law of this Circuit.  As such, JOHNSON's motion should be denied as premature.

F.    **Motions to Adopt Motions of Other Defendants by Alvin Johnson (ECF 189), Daran Hickman (ECF 202), Marcus Williams (ECF 178), Ronnie Finney (ECF 200), and Trayvon Hall (ECF 199)**

Several defendants have filed motions to adopt relevant motions filed by their co-defendants.  Although the government does not object to the adoption of motions of general applicability, it is the government's position that the defendants should be required to particularize their basis for adopting co-defendants' motions to the extent they are relying on different facts or legal authorities.  Otherwise, the government is left in the difficult position of having to guess about the issues to which it should respond and what evidence will need to be presented at the motions hearing.  *See Hickok*, 481 F.2d at 378–79 (a motion to suppress evidence must set forth allegations of relevant factual issues "with definiteness, clarity, and specificity"); *Randle*, 966 F.2d at 1212 ("A defendant who seeks to suppress evidence bears the burden of making a *prima facie* showing of illegality.  Reliance on vague, conclusory allegations is insufficient."); *Benoit*, 730 F.3d at 288 (affirming denial of motion to suppress, finding that the defendant had "not fulfilled his burden of establishing a basis for his motion" because he "offered nothing but conclusory allegations" that law enforcement "may have acted improperly" in obtaining the evidence at issue); *Edmonds*, 438 F. Supp. 3d at 693 (denying defendant's motion to suppress evidence seized during various searches because it was based on "bare, conclusory allegations" and did not "permit either the United States or the Court to meaningfully address the motion or prepare for a hearing, as it does not identify any specific deficiency or area of potential factual dispute").

**G.   Motions for Leave to File Additional Motions by Marcus Williams (ECF 205)**

The government takes no position as to WILLIAMS' motion for leave to file additional motions after the deadline imposed by the Court in this case.  However, to the extent the defendants are allowed to file additional motions, the government respectfully requests at least two weeks to respond.

**III.   CONCLUSION**

For the foregoing reasons, all of the pending motions should be denied.

> Respectfully submitted,
>
> Erek L. Barron
> United States Attorney
>
> By:   _____/s/_____
>       Christina A. Hoffman
>       Kim Y. Oldham
>       Assistant United States Attorneys
>       36 South Charles Street
>       Fourth Floor
>       Baltimore, Maryland  21201
>       (410) 209-4800

56

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 22, 2022, I caused a copy of the foregoing Government's Consolidated Motions Response to be filed electronically with the Court using the CM/ECF system and served to all counsel of record.

/s/

Christina A. Hoffman
Assistant United States Attorney
